IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. TALIAFERRO


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

DONYAL R. TALIAFERRO, APPELLANT.


Filed April 13, 2021.    No. A-20-474.


Appeal from the District Court for Douglas County: PATRICIA A. LAMBERTY, Judge. Affirmed.

Beau Finley, of Law Offices of Beau Finley, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.


MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.


INTRODUCTION

Donyal R. Taliaferro appeals from the order of the district court for Douglas County, denying his motion seeking postconviction relief following an evidentiary hearing. In that motion, Taliaferro alleged, among other things, that his counsel was ineffective for failing to provide him with a witness' deposition prior to entering a guilty plea. We affirm.

STATEMENT OF FACTS

*Conviction and Direct Appeal.*

On April 19, 2013, Taliaferro pled no contest to a charge of robbery, a Class II felony. In exchange for the plea, the State dismissed a second count of robbery, as well as charges of

- 1 -

possession of a deadly weapon by a prohibited person and second offense carrying a concealed weapon on another docket. The factual basis for the robbery charge to which Taliaferro pled shows:

> Taliaferro and his coperpetrator robbed two individuals at gunpoint in their apartment, in the presence of their young child. During the robbery, the coperpetrator sexually assaulted one of the victims; however, Taliaferro was not involved in the assault. The factual basis further recited that police responded to a report of a home invasion and sexual assault and made contact with the victims, a man and his girlfriend. The man advised police that he and his girlfriend had been expecting a female acquaintance, Christie Hughes, to spend the evening with them, that they heard a knock, and that when the man went to the door, he observed that she was the person knocking. However, when he opened the door, two male suspects armed with what appeared to be handguns forced their way into the apartment. The factual basis proceeded with details of the men's actions while in the apartment, and then indicated that shortly after the men left, a warrant was issued for Hughes' arrest for conspiracy to commit robbery. Hughes was arrested, represented by counsel, waived her *Miranda* rights, and gave a statement advising that the individuals who forced their way into the victims' apartment were her acquaintances, one being Taliaferro. The factual basis also indicated that Hughes 'has given a deposition to that effect.'

*State v. Taliaferro*, No. A-18-098, 2019 WL 1528407 at *1 (Neb. App. Apr. 9, 2019) (selected for posting to court website). The district court accepted Taliaferro's plea, found him guilty, and subsequently sentenced him to 30 to 50 years' imprisonment.

Taliaferro, represented by his trial counsel, filed a direct appeal, asserting that his sentence was excessive, and this court summarily affirmed his conviction and sentence. See *State v. Taliaferro*, 21 Neb. App. xxxv (No. A-13-576, Oct. 22, 2013).

*Postconviction Motion and First Postconviction Appeal.*

On September 19, 2014, Taliaferro filed a pro se postconviction motion. His asserted claims included a claim that his trial counsel refused to provide him Hughes' deposition, which he argued would have changed his willingness to enter a plea as opposed to going to trial. The district court denied Taliaferro's motion without an evidentiary hearing, and Taliaferro appealed. In a memorandum opinion, this court determined that an evidentiary hearing was necessary to determine whether Taliaferro's allegations with respect to the failure to provide the deposition prior to entry of his plea had merit. Accordingly, we reversed and remanded for an evidentiary hearing on that single claim. See *State v. Taliaferro*, No. A-18-098, 2019 WL 1528407 (Neb. App. Apr. 9, 2019) (selected for posting to court website).

*Evidentiary Hearing and Present Postconviction Appeal.*

An evidentiary hearing was held before the district court on May 4, 2020 on the issue of whether Taliaferro's trial counsel was ineffective for failing to provide Taliaferro a copy of Hughes' deposition prior to entry of his plea. The court received into evidence copies of the depositions of Taliaferro and his trial counsel (both taken after the resolution of Taliaferro's first postconviction appeal) and the deposition of Hughes (taken in 2013 prior to the entry of Taliaferro's plea of no contest).

In her deposition, Hughes testified that on the evening of the robbery she encountered Ronald Perry (Taliaferro's coperpetrator) and asked him to give her a ride to the victims' residence so she could retrieve her purse, which had been left in the female victim's vehicle on an earlier occasion. Perry drove Hughes to the victims' apartment, stopping his vehicle in front of the apartment complex. Perry waited in the vehicle while Hughes went inside, where she observed four or five people (other than the victims) "manufacturing" or "pilling up" ecstasy at the kitchen table. Hughes obtained her purse from the male victim and spoke with the female victim about potentially spending the night at the apartment. Hughes then left the apartment and returned to Perry's vehicle. During their conversation after she reentered the vehicle, Hughes mentioned the ecstasy in the apartment to Perry. After stopping by another location, where Hughes hoped to retrieve some clothing, Perry received a phone call from Taliaferro, after which he drove them to Taliaferro's residence. Hughes had known Taliaferro for several months, and she had a sexual relationship with him.

After Taliaferro got into Perry's vehicle, Hughes asked Perry to take her back to the victims' apartment. During the drive, Hughes informed Perry and Taliaferro of her intent to spend the night at the victims' apartment. She also mentioned that "they're . . . pilling up some X and shit," "[t]hey should probably make some money," and the female victim might be able to help Hughes return to Arkansas where she had lived previously. According to Hughes, Perry and Taliaferro talked about "hitting a lick at a Wendy's" during the drive (which meant "getting over on someone" and could include a robbery). However, they did not discuss, and she did not participate in any discussions about, robbing the victims. Hughes testified that she did not see either Perry or Taliaferro with a weapon in the vehicle or previously that day. She was also asked if she saw either of them with masks or bandanas in the vehicle, and she responded, "They were in the vehicle. They have always been in the vehicles [sic]. It's not the first time I was in the vehicle." When asked to explain further what she saw, she testified that "[Perry] always kept this black kind of round hat" and that "they always kept red bandanas in the [vehicle]." Hughes indicated that she had ridden in the vehicle approximately four or five times between February and May 2012.

Hughes indicated that the male victim did not like her to bring anyone to the apartment, that he was upset when she was there previously that evening because Perry "had pulled up," and that he instructed her not to be dropped off in front of the apartment when she returned. Accordingly, Hughes had Perry drop her off "a bit" to the west of the apartment complex the second time. She estimated that approximately 45 minutes elapsed between when she and Perry left the apartment the first time and when she returned the second time. After Hughes got out of the vehicle, Perry drove away, and she walked the rest of the way to the apartment. She explained what happened next as follows:

> So when I go into the main entrance and I go to go up the stairs, I hear the door open behind me. So I turn around, and it was [Perry] in his mask and hat, and then I'm assuming with Taliaferro behind him. Taliaferro had on a mask; I didn't see his face. I didn't even -- when I turned around, it was just in a split second, and then [Perry] grabbed me by my hair and he said that, 'Everything would just be cool. It will be okay. Just go and knock on the door.'

Hughes indicated that Perry forced her up the stairs and that after she knocked on the door, it was opened by the male victim. According to Hughes, the masked men then rushed past her into the apartment, knocking her down to her knees. After that, Hughes got up and "took off running" away from the apartment.

Hughes was questioned further about the second masked man, testifying that the man behind Perry was wearing "a Freddy Krueger mask" and holding a silver "revolver." According to Hughes, she had seen Taliaferro with that same silver gun several times prior to the day of the robbery, indicating that Taliaferro always had the gun with him although she had not seen it in the vehicle prior to arriving at the apartment the second time. She had also seen Perry with a gun previously, testifying that his gun was black, but she indicated that she did not see Perry with a gun on the day of the robbery. Hughes was unable to recall exactly what clothes the second man was wearing, but she testified that she recognized him. When asked if the man's outfit matched the outfit that Taliaferro was wearing in the vehicle, Hughes stated:

> Yeah, I recognized them. I mean, I knew when -- I don't know how to explain.
>
> When I turned around, I mean, I knew it, I recognized him. You know, I can't sit here and tell you he had on a red shirt and blue jeans, like I can't recall, but I'm -- I'm knowing, you know. . . .
>
> . . . .
>
> At the time, whenever I go -- I go into the building and I turn around and I look at them, I mean, I've been around them for months and I'm acknowledging that it is them, but, I mean, I can't tell you exactly what he had on today.

Finally, Hughes testified that she did not see the vehicle driven by Perry following her when she walked to the apartment, did not see Perry and Taliaferro walking behind her, and did not see the vehicle parked outside at any point.

Hughes acknowledged changing her story during her interview with police in November 2012 after the robbery, initially telling police that she did not know who the two men were. She also acknowledged initially telling police that she took a "jitney" cab to the apartment.

In his deposition, Taliaferro's attorney testified that he visited Taliaferro in jail on April 4, 2013. Because this meeting occurred after Hughes was deposed on March 27 but prior to when the attorney received the transcribed deposition on April 12, he was unable to read or discuss "verbatim passages" from the deposition with Taliaferro during their meeting. The attorney testified, however, that he "would have gone over the sum and substance" of Hughes' deposition testimony with Taliaferro and would have specifically discussed why he believed that Hughes' deposition testimony amounted to an identification of Taliaferro as one of the perpetrators of the robbery. He indicated that he would have explained to Taliaferro during their meeting why he thought Hughes would not be a good defense witness. According to the attorney, the things he would have discussed with Taliaferro in that regard included what Hughes was doing earlier on the evening in question, the fact that she was at the victims' residence previously and had witnessed "the cutting up of Ecstasy," that she had had "some sort of beef or disagreement" with the individuals at that residence, that she was dropped off initially by Perry, and that she then left with Perry to pick up Taliaferro.

The attorney expressed his opinion that Hughes was very familiar with Taliaferro because of their prior sexual relationship. According to the attorney, he would have told Taliaferro that Hughes believed that the second man was Taliaferro based upon the fact that he was holding the silver revolver that she had seen Taliaferro with on prior occasions and that "he was wearing the same clothing that she had seen [Taliaferro] in in the vehicle just minutes before, and matched his description." The attorney agreed that Hughes was unable to state specifically in her deposition what clothing Taliaferro was wearing on the evening in question. He testified, however, that she "did seem to state that, at least in [the attorney's] understanding of her testimony, that what that [second] individual was wearing matched what . . . Taliaferro was wearing in the [vehicle]." The attorney explained that he understood Hughes' testimony that she recognized the second man, in response to the attorney's question about whether the man's outfit matched what Taliaferro had been wearing "to mean that the clothing description generally matched, even though she couldn't testify during the deposition about the exact clothing he was wearing that night."

According to the attorney, Taliaferro was not surprised by anything the attorney told him about Hughes' deposition testimony during the April 4, 2013, meeting. The attorney did not recall Taliaferro ever asking for a copy of Hughes' deposition during the meeting and did not recall that having a copy was "a huge issue" for Taliaferro at the time. The attorney acknowledged that he did not provide a copy of Hughes' written deposition to Taliaferro given that he did not receive it until April 12 and they were in the process of setting a plea hearing due to Taliaferro's desire to enter a plea. The attorney testified that Taliaferro never provided him with any information that would have established Taliaferro's innocence or conflicted with Hughes' deposition testimony and nothing that would have led him to believe that they should have gone to trial. He testified that after having reviewed Hughes' deposition in light of Taliaferro's postconviction claims, there was nothing in the deposition that he felt was inconsistent with his recollection of the summary he provided to Taliaferro prior to the plea hearing.

After the attorney and Taliaferro discussed Hughes' deposition testimony during their April 4, 2013, meeting, they discussed plea and trial options. The attorney testified that Taliaferro was interested in a plea, particularly in light of the fact that he had a separate charge on another docket and that there was a possibility of the charges being amended in this case to add a use of a firearm count or other counts on an aiding and abetting theory.

The attorney was asked about his recollection of any conversations with Taliaferro during the period between when he received a transcribed copy of Hughes' deposition and the plea hearing. The attorney did not recall any specific communications during that period, but he testified that he presumably would have talked to Taliaferro during that period based upon the fact that they talked fairly regularly. The attorney did not believe that he would have had a specific conversation during that time with Taliaferro about particular sections of the transcribed deposition because the transcription reflected what he had already communicated to Taliaferro.

According to Taliaferro's deposition testimony, his trial attorney summarized Hughes' deposition testimony for him prior to entry of his plea by stating that Hughes "said the same thing that she said in the police reports that [Taliaferro] was the perpetrator of the crime." His "take-away" from his attorney's characterization of Hughes' deposition testimony was that it was consistent with her prior statements made to law enforcement. He indicated that his attorney did not provide him with any specific details of Hughes' deposition testimony. Taliaferro verified that

he did not have either a copy of the deposition or the police reports to review at that time. He testified that the only discussion he had with his attorney about the deposition was an in-person meeting prior to the plea hearing. According to Taliaferro, although he did have phone conversations with his attorney between the time Hughes' deposition was taken and the plea hearing, they did not discuss the contents of Hughes' deposition during any phone conversations.

Taliaferro reviewed a copy of Hughes' deposition in September 2013, following his sentencing. He testified that after doing so, he felt that Hughes' testimony was "insufficient" and that she was not "credible." Taliaferro also testified that he would not have entered a plea had he been given a copy of Hughes' deposition testimony prior to the plea hearing, again stating that he felt "her testimony wasn't credible and her identifications were equivocal of anybody, let alone [Taliaferro]." He affirmed that if he had been given a copy of Hughes' deposition, he would not have entered into a plea agreement, even considering the fact that certain charges against him were dropped and other charges were not filed.

On June 4, 2020, the district court entered an order denying Taliaferro's claim for postconviction relief. The court reviewed the evidence before it, noting that the result hinged on Hughes' deposition and whether the characterization of the deposition by Taliaferro's trial counsel, specifically relating to Hughes' identification of Taliaferro, was accurate. The court found that Taliaferro's trial counsel was not deficient in his summarization of Hughes' deposition testimony with respect to her identification of Taliaferro, stating that "[w]hen you compare what trial counsel relayed to [Taliaferro] prior to his plea compared to the deposition of Hughes, it reflects that Hughes would identify [Taliaferro] at trial." The court concluded that Taliaferro's allegation that the deposition does not reflect an identification of him was unfounded, stating that "[a]lthough counsel did not provide the actual deposition to [Taliaferro] prior to the plea, his performance did equal that of a lawyer with ordinary training and skill in criminal law when he summarized the critical parts of the deposition." Finally, the court found that Taliaferro failed to prove prejudice "in light of the plea agreement and [Taliaferro's] testimony regarding prejudice." Specifically, the court found that Taliaferro did not offer any legitimate evidence relating to prejudice, aside from his claim that he would have insisted on going to trial "if he knew Hughes could not identify him," which the court stated "is not accurate."

Taliaferro then perfected the present appeal to this court.

ASSIGNMENT OF ERROR

Taliaferro asserts that the district court erred by denying his request for postconviction relief.

STANDARD OF REVIEW

Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. *State v. Combs*, 308 Neb. 587, 955 N.W.2d 322 (2021). When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. *Id.* With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Combs, supra*. In an evidentiary hearing for

postconviction relief, the postconviction trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and the weight to be given a witness' testimony. *State v. Russell*, 308 Neb. 499, 954 N.W.2d 920 (2021).

ANALYSIS

Taliaferro asserts that the district court erred by denying his request for postconviction relief. He argues that Hughes' identification of him during her deposition was equivocal and any finding by the court that she recognized him as being the second robber is erroneous. Taliaferro argues that the failure of his trial attorney "to provide verbatim accounts of the Hughes deposition, or at least to provide a summarization of said testimony that reflected the equivocal nature of the identification of [Taliaferro]," constituted a deficient performance. Brief for appellant at 15. He also argues that he was prejudiced by his attorney's deficient performance because had he "been advised of Hughes's exact words or been able to read her sworn statement prior to his plea of no contest," he would have rejected the State's plea offer and would have proceeded to trial. *Id.* at 16.

Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *State v. Combs, supra.* To establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Combs, supra.*

Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Russell, supra.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* When a conviction is based upon a guilty plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *State v. Privett*, 303 Neb. 404, 929 N.W.2d 505 (2019). The two prongs of the test for ineffective assistance of counsel may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *State v. Russell, supra.*

Taliaferro has not shown that his trial counsel's performance was deficient. The district court found trial counsel accurately summarized Hughes' deposition testimony for Taliaferro and that Taliaferro's allegation that the deposition did not reflect an identification of him was unfounded. We agree. The attorney's deposition taken for the evidentiary hearing shows that he explained to Taliaferro that Hughes would not be a good defense witness given her identification of Taliaferro as the man with the gun involved in the robbery, her familiarity with Taliaferro due to their sexual relationship, and her contact with him in the vehicle driven by Perry shortly before robbery. While Hughes' deposition shows that she was unable to describe the clothing worn by Taliaferro, she was unequivocal in stating that he was wearing the same clothing as when he was in the vehicle shortly before the incident. The court's factual finding that Hughes recognized Taliaferro's clothing is not clearly erroneous. It is clear from a review of Hughes' deposition that

- 7 -

she recognized Taliaferro as the same person that had just been in the vehicle with her and that she recognized the silver gun as Taliaferro's gun that she had seen on a number of previous occasions. We do not read Hughes' inability to describe Taliaferro's clothing or the fact that she did not see his face and "assumed" he was Taliaferro as an equivocal identification. The court clearly reviewed her testimony as a whole and found her identification credible based on her intimate familiarity with Taliaferro, and her recent contact with him in the vehicle. Taliaferro's trial attorney appropriately and adequately summarized Hughes' deposition testimony prior to the plea hearing, and Taliaferro has not established deficient performance.

Likewise, Taliaferro did not establish prejudice from his trial counsel's failure to provide him with a copy of Hughes' deposition prior to entry of his plea. In a claim for ineffective assistance of counsel, the likelihood of the defense's success should be considered with other factors such as the likely penalties the defendant would face if convicted at trial, the relative benefit of the plea bargain, and the strength of the State's case. *State v. Beehn*, 303 Neb. 172, 927 N.W.2d 793 (2019). At an evidentiary hearing, self-serving declarations that the claimant would have gone to trial will not be enough; he must present objective evidence showing a reasonable probability that he would have insisted on going to trial. *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018), *disapproved on other grounds, State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018). Taliaferro agreed to plead to one count of robbery in exchange for the State dismissing the second count of robbery charged in this case along with the charges in a separate docket (possession of a deadly weapon by a prohibited person and second offense carrying a concealed weapon). In his deposition, Taliaferro acknowledged the possibility that had he proceeded to trial in the current case, the State could have added two additional use of a weapon charges and a felon in possession charge. Clearly, he received a substantial benefit from the plea bargain in terms of a significant reduction in possible penalties. And, he has not demonstrated the likelihood of success based on any challenge to Hughes' identification of him as one of the perpetrators of the robbery. Although Hughes did not see Taliaferro's face because he was wearing a mask, she identified Taliaferro as the second robber and the gun held by this man as Taliaferro's gun. She was quite familiar both with Taliaferro and his silver gun. Taliaferro has not shown a reasonable probability that he would have rejected the State's generous plea offer and risked facing hundreds of years in prison but for his trial counsel's failure to provide him with a copy of Hughes' deposition prior to the plea hearing.

CONCLUSION

The district court did not err in denying Taliaferro's motion for postconviction relief.

AFFIRMED.